# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL HOPSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:15-cv-01020-RDP** |
| | } | |
| **CITY OF BIRMINGHAM, ALABAMA, et al.,** | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on (1) the Motion for Summary Judgment filed by Defendants City of Birmingham, A.C. Roper, Henry Higgins, Chad Hallman, Bryan Smith, and Michael Allison (Doc. # 64), (2) Plaintiff's Motion to Have Admission Deemed Admitted (Doc. # 66), and (3) Defendants' Amended Objection to Plaintiff's Motion to Deem Admitted and in the Alternative Motion to Withdraw and/or Amend Admissions Responses and Accept as Timely Submitted (Doc. # 69).  The motions have been briefed and are under submission.  (Docs. # 64-1, 66, 68, 71).  After careful review, and for the reasons explained below, Plaintiff's motion to deem certain requests for admission to be admitted is due to be granted, Defendants' motion to withdraw or amend the responses to those requests for admission is due to be denied without prejudice for purposes of the summary judgment proceedings, and Defendants' motion for summary judgment is due to be granted.

# I.    Factual Background[1]

This case arises from a rather unusual chain of events that concluded with the burglary of Plaintiff's residence.    On June 17, 2013, Defendants Henry Higgins, Chad Hallman, Bryan Smith, and Michael Allison (collectively referred to as the "officers") responded to a reported burglary in progress at 1041 Northwood Drive in Birmingham, Alabama (hereinafter the "Residence").  (Doc. # 64-2 at 10).  Defendants Higgins, Hallman, Smith, and Allison were all police officers for the City of Birmingham Police Department.  (*Id.* at 8, 16, 24, 32).  A dispatcher directed the officers to the Residence at approximately 8:20 a.m. on June 17th.  (Doc. # 67-1 at 4).  The dispatcher informed the officers that an individual at the residence, Scottie Carroll, had seen someone inside the Residence, had reported the Residence as foreclosed property, and had explained that no one was supposed to be inside the Residence.  (Doc. # 64-2 at 10, 18, 26, 34).  Scottie Carroll told the dispatcher that he would be inside of a Ford F-150.  (Doc. # 67-1 at 1).  He reported that another vehicle, a red Chevy Avalanche, was parked in the driveway.  (*Id.*).

When the officers arrived at the Residence, they spoke with Scottie Carroll, Kristina Carroll, and Edward Logan.  (Doc. # 64-2 at 10, 18, 26, 34).  Logan and the Carrolls reported that they were at the Residence on behalf of a property management company, H & T Properties, Inc.  (*Id.*).  Scottie Carroll presented a work order document to the officers.[2]  (*Id.*).  He told the

---

[1]    The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  Notably, most of the parties' factual assertions are undisputed by the opposing party.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2]    The officers' affidavits assert that the work order is attached to their affidavits, but no work order has been attached to them.  (*See generally* Doc. # 64-2).

officers that they were at the Residence to perform property maintenance, grass cutting, and an inspection.[3]  (*Id.*).  Logan and the Carrolls reiterated to Defendants Allison, Higgins, and Smith that the Residence was supposed to be vacant.[4]  (*Id.* at 18).  Allison, Higgins, and Smith relayed this information to Defendant Hallman.  (*Id.*).

Scottie Carroll provided the officers paperwork indicating that maintenance was supposed to be performed at the Residence.  (*Id.* at 11, 19, 27, 35).  A work order in the Rule 56 record states that Wells Fargo instructed H & T Properties to recut the Residence's lawn.  (Doc. # 67-2).  The work order identifies Wells Fargo as the mortgage company for the Residence.  (*Id.*).  It directs H & T Properties to perform the lawn work "on or near" June 14, 2013 and states that employees "must go inside" the Residence and inspect it.  (*Id.*).  After reviewing the work order, the officers instructed Carroll to call the property management company to confirm that the Residence was owned by Wells Fargo and was supposed to be vacant.  (Doc. # 64-2 at 11, 27, 35).  Scottie Carroll called Alan Hauck, who he identified as the owner of H & T Properties. (*Id.* at 11, 19, 27, 35).  Carroll spoke with Hauck.  (*Id.*).

The Rule 56 record contains conflicting evidence on whether Hauck spoke with the officers during that call.  On the one hand, Defendants Higgins, Hallman, Smith, and Allison all aver that Hauck confirmed the Residence's vacancy status with them by phone and stated that Logan and the Carrolls were agents of H & T Properties.  (*Id.* at 11, 19, 27, 35).  Defendants

---

[3]  Plaintiff objects to the officers' testimony regarding this statement by Scottie Carroll on hearsay grounds. (Doc. # 66 at 4).  This objection is due to be overruled because Scottie Carroll's statement is not offered by the officers to prove the truth of what Carroll asserted.  Rather, Carroll's statement is offered to show what information had been given to the officers before they entered the Residence.  *See Macuba v. Deboer*, 193 F.3d 1316, 1323-24 & n. 15 (11th Cir. 1999) (explaining that an out-of-court statement by another individual can be asserted in a summary-judgment affidavit if it is not offered to prove the truth of what is asserted, such as where the significance of the statement lies solely in the fact it was made).

[4]  The officers' affidavits conflict on this point insofar as Allison, Higgins, and Smith have averred that Hallman overheard that the Residence was vacant, whereas Hallman has averred that he learned this information from Allison, Higgins, and Smith.  (*See* Doc. # 64-2 at 10, 18, 26, 34).  Nevertheless, this dispute is immaterial because it has not been disputed that all four on-site officers knew Scottie Carroll's belief that the Residence should have been vacant.

Higgins, Smith, and Allison also recall that Hauck authorized entering the Residence by force, if necessary. (*Id.* at 11, 27, 35). On the other hand, Defendants Smith and Hallman testified during their depositions that they did not recall speaking with Hauck on June 17th. (Docs. # 67-4 at 33; 67-5 at 24-25, 34). Indeed, neither Smith nor Hallman could recall which officer spoke to Hauck. (*See id.*). Given the conflicting evidence about Hauck's call, the court determines, solely for purposes of summary judgment, that Hauck did not speak with Defendants Higgins, Hallman, Smith, or Allison before they entered the Residence.

After Scottie Carroll's call to Hauck, Kristina Carroll knocked on a door at the Residence and received no response. (Doc. # 64-2 at 11, 19, 27, 35). She attempted to unlock doors at the Residence with keys in her possession but could not open any of the doors. (*Id.*). Scottie Carroll also attempted to unlock doors at the Residence without success. (*Id.*). He told the officers at the scene "that his supervisor had said to force entry if necessary." (*Id.*). Defendants Higgins, Hallman, Smith, and Allison called their supervisor, Sergeant Cristopher Hays. (*Id.*). They informed Hays that they would forcibly enter the Residence because a burglary suspect potentially was inside.[5] (*Id.*).

After Hays agreed to the forced entry, Defendant Hallman forced open the Residence's rear door. (*Id.* at 19). Hallman, Higgins, and Allison entered the garage and observed a boat, motorcycle, and four-wheeler. (*Id.* at 11, 19, 35). They asked Scottie Carroll again whether the Residence was supposed to be vacant, and Carroll suggested that the previous owner likely had returned to the Residence as a squatter. (*Id.*). The officers asked Carroll to reconfirm the Residence's vacancy status with Hauck, and in turn Hauck reaffirmed that the Residence was supposed to be vacant. (*Id.* at 11-12, 19-20, 35-36). The officers' affidavits do not indicate that

---

[5] Plaintiff objects to Defendants' assertion that exigent circumstances existed when the officers entered the Residence. This fact is recounted solely for the undisputed information that Higgins, Hallman, Smith, and Allison gave to Hays. The legal issues will be addressed further below.

any of them personally spoke with Hauck when he reaffirmed the Residence's vacancy status. (*See* Docs. # 64-2 at 12, 19-20, 35-36; 67-3 at 6; 67-5 at 29-30). (*But see* Doc. # 67-3 at 4) (recounting that officers spoke with a supervisor for the property management company after entering the Residence and finding a sparsely furnished interior). Hallman, Higgins, and Allison also asked a dispatcher to run the tags on the vehicles in the garage. (Doc. # 64-2 at 12, 20, 36). A dispatcher informed them that Plaintiff owned one vehicle and Ursula Hopson owned a second vehicle. (*Id.*). Moreover, the dispatcher informed them that the vehicles were registered at a different address than the Residence. (*Id.*).

Thereafter, Defendants Hallman, Higgins, and Allison entered the house through an unlocked interior garage door. (*Id.*). They let Defendant Smith into the house through the front door. (*Id.* at 27). The four officers searched the Residence but found no one inside. (*Id.* at 12, 20, 27, 36). They observed that the Residence was sparsely furnished and had no refrigerator inside. (*Id.* at 12, 20, 27-28, 36). Defendant Higgins reported a cooler full of ice and drinks in the kitchen. (Doc. # 67-3 at 5-6). And, according to Defendant Hallman's deposition testimony, another officer found a small rifle on the premises. (Doc. # 67-5 at 37). The officers exited the Residence and told Scottie Carroll what they had found in the Residence. (Doc. # 64-2 at 12, 20, 28, 36). Carroll expressed surprise when the officers informed him that the electricity was on at the Residence, and he told someone in a phone conversation that the door would have to be repaired. (*Id.*).

Plaintiff's burglar alarm at the Residence went off when the officers entered it. (*See* Doc. # 64-3 at 45) (pages 22-24 of Vickie Young's deposition). The City of Birmingham Police Department's dispatch unit received a call from ADT Security about the alarm at approximately

8:44 a.m. on June 17, 2013.[6] (Docs. # 66 at 11; 71 at 5). Defendants concede that ADT Security provided the dispatch unit with Plaintiff's name during the call about that alarm. (*Id.*).

While the officers stood outside the Residence, Louis Whitlow approached Defendant Allison and said that the Residence had been sold to "a guy I know [who] works as US Steel." (Doc. # 64-2 at 36). Whitlow recounted that the Residence's owner hunted with him. (*Id.*). Allison asked Whitlow if he could get in contact with the owner, but Whitlow said he could not after looking at his cell phone. (*Id.*). Allison told Whitlow that the property management workers had paperwork to justify their presence at the Residence. (*Id.*). Whitlow then stated that the red truck parked in the driveway belonged to the Residence's owner, but Allison retorted that the truck was registered to a different address. (*Id.*). Ultimately, Whitlow "became agitated and walked away." (*Id.*).

Scottie Carroll told the officers that he would inspect the interior of the Residence and repair the door. (*Id.* at 12, 20, 28, 36). He assured them that he would be at the Residence if any further information was needed. (*Id.*).

Following the forced entry, Hays called Hauck and left a voicemail message. (Doc. # 67-6 at 31-32). Hays received a call from a representative for a Wells Fargo contractor. (*Id.* at 32). That individual reported to Hays that the Residence was owned by Wells Fargo and should have been vacant. (*Id.*).

At 11:15 a.m. on June 17, 2013, Plaintiff called the City of Birmingham Police Department and reported that his back door had been kicked in. (Doc. # 64-2 at 50). Defendants Higgins, Hallman, Smith, and Allison were called back to the Residence for a reported burglary. (*Id.* at 12, 20, 28, 36-37). Hays also travelled to the Residence. (*Id.* at 12, 20, 28, 37). Plaintiff told the officers that he owned the Residence and had just moved into it. (*Id.*). Plaintiff reported

---

[6] This fact is undisputed but is not supported by Plaintiff's citations to the Rule 56 record.

that several items had been taken from the Residence, including a safe with $30,000, an Xbox and Xbox games, clothing, a camcorder, a ring, a watch, a gold necklace, a gas can, an edge trimmer, an electric chainsaw, and a weed eater. (*Id.*).

Defendant Hallman called Scottie Carroll and directed Logan and the Carrolls to return to the Residence. (*Id.* at 13, 20-21, 28, 37). When Defendant Smith began to pat down Logan, Logan spontaneously said that he had a ring and a watch that his wife had given him. (*Id.* at 13, 21, 28-29, 37). Plaintiff described the ring and watch in Logan's possession without seeing them. (*Id.* at 13, 21, 29, 37). The officers found a gas can at the scene and returned it to Plaintiff. (*Id.*). They discovered the gold necklace, edge trimmer, chainsaw, and weed eater in another vehicle that Logan and the Carrolls had gone to after leaving the Residence. (*Id.*). The officers took the Xbox, Xbox games, and tennis shoes as evidence of the burglary. (*Id.*).

On June 18, 2013, Samantha Nichols, an employee of National Fields, contacted Hays and informed him that Wells Fargo mistakenly told National Fields to stop working at another address when Wells Fargo should have stopped work at the Residence. (*Id.* at 64). Because of this error, "National Fields and H & T Properties both thought the [Residence] was vacant and anyone inside the residence was there illegally." (*Id.*). According to Nichols, this error led Hauck to permit a forced entry into the Residence. (*Id.*). In August 2014, Scottie Carroll pled guilty to third-degree theft of property in Jefferson County Circuit Court and agreed to pay $30,000 in restitution. (Doc. # 64-3 at 33).

## II.     Motion to Deem Requests for Admission as Admitted

Plaintiff moves for the court to deem seven of the Requests for Admission he sent to Defendants Higgins, Hallman, Smith, Allison, and the City of Birmingham as admitted because they were served on January 28, 2017, and were not answered until March 29, 2017. (Doc. # 66

at 16-17).  Most significantly, Plaintiff claims that Defendants allowed discovery to close and submitted their motion for summary judgment before they served answers to the admission requests.  (*Id.* at 17).  Plaintiff argues that he would be prejudiced if the court did not deem the requests for admission to be admitted because defense witnesses have testified that they cannot recall many of the facts at issue in this case.  (*Id.* at 19).

Defendants respond that the court should deem their responses to be timely because their defense of the merits would be jeopardized by the admissions Plaintiff seeks.  (Doc. # 68 at 1-2).  They summarily argue that Plaintiff will not be prejudiced if the court permits their late responses to the requests for admission to stand.  (*Id.* at 2).  They ask the court to accept their responses as if they were timely filed.  (Doc. # 69).

Plaintiff asks the court to deem the following seven requests for admission as admitted:

9.     That Officers of the Birmingham Police Department did not independently verify the validity of the work order presented by Scottie Carroll and/or another individual present upon their initial arrival to the Plaintiff's Residence.

10.    That Officers of the Birmingham Police Department did not independently communicate directly or indirectly with anyone regarding ownership or occupancy of the Plaintiff's Residence.

11.    That, upon Officers of the Birmingham Police Department entry into Plaintiff's Residence, the security system of the Plaintiff's Residence sounded its alarm siren.

12.    That, upon Officers of the Birmingham Police Department entry into Plaintiff's Residence and sounding of the alarm siren, the Police Officers deactivated, caused to be deactivated or approved deactivation of the alarm siren of the Plaintiff's Residence.

13.    That, upon Officers of the Birmingham Police Department entry into Plaintiff's Residence and sounding of the alarm siren, the Police Officers suppressed, caused to be suppressed or approved suppression/ "calling off" of the alarm call with ADT Security.

14.     That Officers of the Birmingham Police Department left, caused to leave, or approved leaving Plaintiff's Residence in control of Scottie Carroll and his associates.

15.     That Officers of the Birmingham Police Department failed to secure Plaintiff's Residence by leaving Plaintiff's Residence in control of Scottie Carroll and his associates.

(Doc. # 67-10 at 3-5). Plaintiffs issued similar requests for admission directed at the individual officers concerning their individual conduct. (Doc. # 67-9 at 3-4). Defendants submitted responses to these requests for admission on March 29, 2017. (*See generally* Doc. # 67-11).

According to Federal Rule of Civil Procedure 36(a)(3), "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." If a party fails to respond within 30 days, "[a] matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). When considering such a motion, "the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." *Id.* Thus, Rule 36(b) establishes a two-part test the court must apply when "considering the withdrawal of admissions: first, that the presentation of the merits will not be subserved by the withdrawal, and second, that the party obtaining the admissions would not be prejudiced in its presentation of the case by the withdrawal." *Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1577 (11th Cir. 1988) (citation and emphasis omitted).

Although the court has discretion whether to permit a party to withdraw an admission, the court "abuses its discretion under Rule 36(b) in denying a motion to withdraw or amend

admissions when it applies some other criterion beyond the two-part test—or grossly misapplies the two-part test—in making its ruling." *Perez v. Miami-Dade Cty.*, 297 F.3d 1255, 1265 (11th Cir. 2002). The court is guided by the Advisory Committee's observation that the possibility of withdrawal or amendment "emphasizes the importance of having the action resolved on the merits, while at the same time assuring each party that justified reliance on an admission in preparation for trial will not operate to his prejudice." Fed. R. Civ. P. 36 Advisory Committee Note (1970 Amendment).

A party appropriately seeks to withdraw an admission when "upholding the admissions would practically eliminate any presentation of the merits of the case." *Perez*, 297 F.3d at 1266 (quoting *Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995)). The prejudice prong concerns "the difficulty a party may face in proving its case, *e.g.*, caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions." *Smith*, 837 F.2d at 1578 (quoting *Brook Vill. N. Assocs. v. Gen. Elec. Co.*, 686 F.2d 66, 70 (1st Cir. 1982)). A party obtaining admissions is not prejudiced merely because it will have to prove facts presented in the requests for admission. *Id.* "For this reason, a court is more likely to find prejudice when a party seeks to withdraw its admissions once trial has already begun." *Perez*, 297 F.3d at 1266-67

Here, Defendants have not met the two-part test for withdrawing their admissions. Plaintiff's requests for admission to Defendants are due to be deemed admitted by rule because the City did not respond in writing until more than 30 days after service. (*See* Docs. # 67-10 at 6-7; 67-11 at 7, 14, 21, 28, 35). After careful review, the court finds that admission of the seven requests presented in Plaintiffs' opposition brief/motion would not practically eliminate Defendants' presentation of the merits. *Perez*, 297 F.3d at 1266. Although the facts addressed

by requests 9 and 10 pertain to the officers' apparent authority to enter the Residence, Defendants can rely on other facts to support their apparent authority (*e.g.*, the work order presented to them by Scottie Carroll and Carroll's representations to them). And, in the alternative, Defendants have argued that the officers' warrantless entry into the Residence was justified by the exigent circumstances presented in Carroll's report of an unauthorized individual in the Residence. Without addressing whether the other requests for admission would practically eliminate any particular Defendant's ability to litigate the merits, the court finds that the seven requests presented in Plaintiff's opposition brief can be deemed admitted without eliminating Defendants' ability to oppose the merits of this matter.

Moreover, in this instance, Plaintiff has shown that he would be prejudiced by allowing Defendants to amend their responses to the requests after discovery. Significantly, Defendants served their responses after the end of the discovery period on February 28, 2017 and after filing a motion for summary judgment on behalf of all remaining Defendants on March 28, 2017. Defendants have offered no defense, reason, or excuse for the late submission of the City's responses. In addition, the Rule 56 record shows that the officers have claimed ignorance of the factual assertions covered by the requests for admission. For example, Defendants Smith and Hallman lacked any recollection of whether an alarm sounded when they forced entry into the Residence,[7] a fact that tends to support Plaintiff's position that they should have realized the Residence was not vacant. (Docs. # 67-4 at 36; 67-5 at 30, 39). Because the individual officers could not recall an audible alarm or the presence of an alarm system, Plaintiff likely relied on the City to inform him whether it could admit or deny the sounding of an audible alarm based on the information known to it at the close of discovery. When the City failed to answer that request

---

[7] For purposes of the Rule 56 motion filed in this case, it is undisputed that the alarm company contacted the Birmingham Police Department, a fact that suggests an alarm sounded upon entry of the Residence.

for admission before the close of discovery and submitted an answer after its filing of a dispositive motion, it produced a "sudden need" for Plaintiff to obtain additional evidence that established the sounding of an alarm. *Cf. Smith*, 837 F.2d at 1578. Although the court granted Plaintiff additional discovery under Rule 56(d) (*see* Doc. # 63), Plaintiff still suffered prejudice at the summary judgment stage by Defendants' submission of the late responses because he suddenly had to seek out additional evidence regarding the subject matter of the requests. Therefore, Plaintiff's motion to deem the aforementioned requests for admission admitted (Doc. # 66) is due to be granted, and Defendants' motion to withdraw or amend its responses (Doc. # 69) is due to be denied without prejudice for purposes of the motion for summary judgment.

## III. Standard of Review for Defendants' Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts

about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## IV.     Analysis of Motion for Summary Judgment

For the reasons explained below, Defendants are entitled to summary judgment on all claims brought against them in the Complaint.

### A.     Defendants Higgins, Hallman, Smith, and Allison are Entitled to Qualified Immunity from Plaintiff's 42 U.S.C. § 1983 Claim

Defendants Higgins, Hallman, Smith, and Allison assert qualified immunity from the § 1983 claim against them in the Complaint. They argue that their entry into the Residence did not violate Plaintiff's Fourth Amendment rights because (1) the reported burglary created an exigent circumstance justifying the warrantless entry, and (2) the individuals on site possessed apparent authority to consent to the entry. (Doc. # 64-1 at 20-21). In response, Plaintiff argues that the officers clearly lacked consent to enter the Residence because they failed to inquire into Scottie Carroll's authority over the Residence after receiving ambiguous consent from him to forcibly enter it. (Doc. # 66 at 23-27). Moreover, Plaintiff claims that the officers had a duty to protect his property after they unconstitutionally entered the Residence and placed his property at risk. (*Id.* at 27-28). Plaintiff also argues that the officers lacked exigent circumstances to enter the Residence based on the information they received before entry. (*Id.* at 31). Finally, Plaintiff insists that, if the officers had an urgent need to enter the Residence, that need was obviated when they stopped in the garage to reconfirm who owned the Residence. (*Id.* at 31-32).

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether a defendant is entitled to qualified immunity is determined by engaging in a three-step analysis. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136-37 (11th Cir. 2007). The initial burden is on an official claiming qualified immunity to establish that he or she was acting within his or her discretionary authority. *Id.* Here, Plaintiff has not disputed the officers' claim that they acted within the scope of their discretionary authority when they investigated the burglary allegations and entered the Residence.

Once the discretionary-authority showing is made, the burden shifts to a plaintiff to show that the "defendant's conduct violated a statutory or constitutional right." *Id.* at 1137. Finally, "the plaintiff must show that the violation was 'clearly established.'" *Id.*; *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003) ("When case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state.") (citing *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1032-33 n. 10 (11th Cir. 2001) (en banc)). "There are three ways in which [a plaintiff] may show that the right violated was clearly established: '(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Perez v. Suszcynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92

(11th Cir. 2009)).  If a defendant can establish that he is entitled to qualified immunity, then the federal, individual capacity claims will be dismissed.  *See Randall v. Scott*, 610 F.3d 701, 714 (11th Cir. 2010).

In his opposition brief, Plaintiff has not argued that the Defendant officers violated his First Amendment right to privacy, as alleged in the Complaint.   (*See* Doc. # 66 at 19-32).  Plaintiff only argues against summary judgment on his Fourth Amendment theory.   As such, Defendants are due to be granted summary judgment on any § 1983 claim premised on a violation of Plaintiff's First Amendment right to privacy because Plaintiff effectively abandoned that claim when he did not argue in support of it in his opposition brief.  *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325-26 (11th Cir. 2000) (holding that a state law claim was effectively abandoned when a party failed to brief and argue the issue before the district court).

As discussed above, Plaintiff contends that the officers violated his Fourth Amendment rights by entering the Residence without a warrant.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).   "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, see *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), or from a third party who possesses common authority over the premises, see *United States v. Matlock*, [415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974)]."  *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).  Nor does it apply when "probable cause and exigent circumstances exist" to justify the warrantless entry.  *Hill v. Orange Cty. Sheriff*, 666 F. App'x 836, 839 (11th Cir. 2016).

### 1.     The Officers Received Sufficient Consent to Enter the Residence

As the Eleventh Circuit has recognized, in *Rodriguez*, the Supreme Court held that an officer may receive valid consent to enter a residence from "a person with actual or apparent authority." *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014) (citing *Rodriguez*, 497 U.S. at 186-89). "A third party has apparent authority to consent to a search if an officer could have reasonably believed the third party had authority over the area searched." *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (citing *Rodriguez*, 497 U.S. at 188-89). "While a landlord generally lacks common authority to consent to a search of a tenant's apartment, a tenant who abandons the property loses any reasonable expectation of privacy he once had[.]" *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997) (citations omitted). The *Rodriguez* opinion cautioned, though, that an officer cannot accept voluntary consent to enter a residence in all circumstances:

> [W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment … 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Rodriguez*, 497 U.S. at 188-89.

Here, it is undisputed that Scottie Carroll called the police officers to the scene, identified himself as an agent for H & T Properties, and presented a work order for H & T Properties to cut the Residence's lawn and enter the Residence. (Docs. # 64-2 at 10-11, 18-19, 26-27, 34-35; 67-2). The work order indicated that Wells Fargo possessed authority over the Residence, as the

mortgage company, and granted H & T Properties authority to enter it for an inspection. (Doc. # 67-2). The work order did not expressly state that it expired on June 14, 2013, nor did it specify the individuals to perform the work at the Residence. (*Id.*). The court has reviewed the work order, which was placed in the Rule 56 record by Plaintiff. The court has found nothing in the work order that would have alerted a reasonable officer to the possibility that the order was forged in any respect or that it was used as a pretext by the reporting parties to gain access to the Residence. Indeed, the typewritten portion of the work order includes the Residence's address and identifies H & T Properties as the recipient of the work order. (*Id.*). In addition, Scottie Carroll reported to a dispatcher and three of the officers that the Residence was supposed to be vacant. (Doc. # 64-2 at 10, 18, 26, 34). The officers asked him to confirm Wells Fargo's ownership of the Residence, and Scottie Carroll reaffirmed that Wells Fargo owned the Residence after calling Hauck, a supervisor for H & T Properties. (*Id.* at 11, 19, 27, 35).

Under these undisputed facts, a reasonable officer could have believed that H & T Properties -- and, in turn, its on-site agents in possession of a work order -- possessed authority to consent to the search. *Barber*, 777 F.3d at 1305. The work order indicates that H & T Properties managed the Residence on behalf of Wells Fargo and had authority to enter the Residence. (*See* Doc. # 67-2). The on-site agents informed the officers that the Residence was supposed to be vacant, and Scottie Carroll subsequently gave the officers consent to enter the Residence by force. (Doc. # 64-2 at 10-11, 18-19, 26-27, 34-35). The consent granted to the officers by the on-site agents in this case is similar to the consent granted by a landlord in *Brazel*. There, a detective asked the owner of an apartment for consent to search the apartment because both the detective and the owner believed it to be vacant. *Brazel*, 102 F.3d at 1148. The officer believed it was vacant because the tenant had been arrested at another location; the owner could

not recall why he believed the apartment was vacant. *Id.* at 1148-49. Under those circumstances, the Eleventh Circuit affirmed the admission of evidence seized at the apartment because "the officer's belief that the premises were vacant was 'objectively reasonable' on the facts provided to him, which were consistent with his own knowledge about the case." *Id.* at 1149. Here, while the officers had not conducted any investigation before they received the report of a burglary at the Residence, they received a work order consistent with Scottie Carroll's report that the Residence was vacant, since the work order directed H & T Properties to perform lawn maintenance on or around June 14, 2013, three days before the reported burglary. (*See* Doc. # 67-2). And, Carroll informed the officers (after calling Hauck) that the property was owned by Wells Fargo. (*Id.* at 11, 19, 27, 35). Under these circumstances, the officers' beliefs that the Residence was vacant and that Scottie Carroll had authority to authorize their forced entry was objectively reasonable. *Cf. Barber*, 777 F.3d at 1305; *Brazel*, 102 F.3d at 1148-49.

Plaintiff argues that the officers' warrantless entry was not reasonable because (1) the situation presented ambiguous authority to consent to entering the house, and (2) the officers failed to further inquire into Carroll's authority to consent. (Doc. # 66 at 23-26). The Rule 56 record demonstrates, though, that the officers asked Scottie Carroll to contact his supervisor and confirm the Residence's vacancy status before entering the Residence. (Doc. # 64-2 at 11, 19, 27, 35). Three of the officers asked Carroll to check the vacancy status again when they observed vehicles inside the Residence's garage. (*Id.* at 11-12, 19-20, 35-36). Moreover, they asked a dispatcher to run the tags on the vehicles found inside the Residence and discovered that they were registered at a different address. (*Id.* at 12, 20, 36). Plaintiff offers no authority -- much less any clearly established precedent from the Supreme Court, Eleventh Circuit, or Alabama Supreme Court -- to support his argument that the officers were required to

independently verify the work order by personally communicating with another individual at H & T Properties in order to perform a "further inquiry" into Carroll's authority to consent. (*See* Doc. # 66 at 24-25). Thus, the court concludes that the officers conducted a sufficient inquiry into Carroll's authority to rely on his apparent consent to enter the Residence's garage and the Residence itself.

Alternatively, Plaintiff argues that the officers discovered their lack of consent to enter the residence once they discovered property inside of the Residence (including a cooler, drinks, and vehicles) and learned from Whitlow that someone had purchased the Residence. (Doc. # 66 at 26-27). However, this argument fails to establish any Fourth Amendment violation because the officers only learned that information after they had entered the Residence. As stated in *Rodriguez*, the court must analyze a Fourth Amendment claim based on the information known to the officer at the time the alleged violation occurred. *Rodriguez*, 497 U.S. at 188-89.

Because the officers received apparent consent from Scottie Carroll to enter the Residence, and they conducted further inquiry into Carroll's authority to consent (1) before forcibly entering and (2) after observing vehicles in the Residence's garage, the officers did not violate Plaintiff's clearly established Fourth Amendment rights by entering the Residence. *Cf. Barber*, 777 F.3d at 1305. Therefore, Defendants Higgins, Hallman, Smith, and Allison are entitled to qualified immunity from Plaintiff's § 1983 claim against them.[8]

---

[8] The court need not decide -- and does not decide -- whether the officers' entry into the Residence was justified by exigent circumstances. "The [exigent circumstances] exception encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). Defendants argue that the call to the Residence presented exigent circumstances because Scottie Carroll reported a burglary at the residence. (Doc. # 64-1 at 20). But, the authorities Defendants rely upon present additional facts supporting a finding of exigent circumstances.

For example, in *Hill v. Orange County Sheriff*, 666 F. App'x 836 (11th Cir. 2016), the officers entered a residence without a warrant to search for a suspect charged with violent felonies who had been tracked him to a particular street using his cell phone. *Id.* at 840. There, the officers' concern for public safety was reasonable, in

### 2. Alternatively, Defendants Higgins, Hallman, Smith, and Allison Had No Clearly Established Duty to Secure the Residence Until They Identified Its Actual Owner

Plaintiff alternatively contends the officers should have discerned that they lacked consent to enter the Residence from its actual owner when Whitlow told an officer that someone had purchased it. (Doc. # 66 at 27). Because the officers violated his Fourth Amendment rights by entering the Residence, Plaintiff argues that they "had a duty to protect his property and avoid it being compromised." (*Id.* at 27-28). However, Plaintiff has offered no legal authority in support of such a duty in his opposition brief, and the court has found none.

Plaintiff's argument that the officers had a constitutional duty to protect his property at the Residence after their allegedly unconstitutional entry rests on a premise that has been foreclosed by the Eleventh Circuit: that a public officer can violate an individual's substantive due process rights by placing the individual in special danger of harm through his or her

---

part, because the known suspect had been charged with violent felonies involving a firearm. *Id.* In this case, the officers possessed no knowledge about the suspected burglar and could have prevented any escape by covering the exits while obtaining a search warrant.

In *United States v. $291,828.00 in U.S. Currency*, 536 F.3d 1234 (11th Cir. 2008), two officers conducted two sweeps of a residence after a burglar alarm went off and the owner told the security company to dispatch police. *Id.* at 1235-36. During a civil forfeiture proceeding, the owner argued that the officers lacked exigent circumstances to justify the second sweep once one of the officers found no burglar in the first sweep and exited the residence. *Id.* at 1238-39. The Eleventh Circuit suggested in that opinion that the owner's request to search for the burglar might have itself created exigent circumstances, but declined to decide whether the owner had consented to the second sweep because that exception to the warrant requirement was not raised by the parties. *Id.* at 1238 n. 2. Unlike the search presented in *$291,828.00 in U.S. Currency*, the parties here have addressed whether the warrantless entry was justified by the property manager's consent. And, the parties have not addressed the possibility that the officers could have prevented any escape and preserved the evidence at the scene by deploying the four officers present to the Residence's exits while obtaining a warrant.

Although the cases presented by the officers in support of their belief that an exigent circumstance existed when they entered the Residence are distinguishable, the court declines to determine whether the officers reasonably could have believed that an exigent circumstance justified their warrantless entry into the Residence. Such an analysis is unnecessary because, here, as explained above, the officers reasonably relied on Scottie Carroll's apparent authority to consent to the warrantless entry.

affirmative acts.[9]  *Cf. White v. Lemacks*, 183 F.3d 1253, 1255 (11th Cir. 1999) (describing the

holding from *Cornelius v. Town of Highland Lake*, 880 F.2d 348 (11th Cir. 1989)).  In *White v.*

*Lemacks*, the Eleventh Circuit held that "government officials violate the substantive due process

rights of a person not in custody only by conduct 'that can properly be characterized as arbitrary,

or conscience shocking, in a constitutional sense.'"  183 F.3d at 1258 (quoting *Collins v. City of*

*Harker Heights*, 503 U.S. 115, 128 (1992)).  That is, a public official does not violate an

individual's substantive due process rights by placing him or her in special danger of harm

through affirmative conduct unless the conduct is arbitrary or shocks the conscience.  *Id.*  Here,

the officers' conduct -- leaving the Residence under the authority of Logan and the Carrolls after

effectively disabling the Residence's alarm and receiving conflicting information about the

owner of the Residence -- is not arbitrary or shocking to the conscience under clearly established

law.  Indeed, the alleged constitutional violation is analogous to a state-law negligence claim that

the officers breached their duty of care by leaving the Residence under the control of Logan and

the Carrolls after disabling the door lock and alarm installed at the Residence.  *Cf. White*, 183

F.3d at 1258 (explaining that a state-law claim "dressed up in substantive due process clothing"

is generally not viable).  Because Plaintiff has not shown the constitutional basis for the officers'

duty to protect his property from Logan and the Carrolls after their entry into the Residence, the

officers are entitled to summary judgment for any § 1983 claim based on leaving the Residence

under the control of Logan and the Carrolls after investigating the burglary complaint.

---

[9]  To be clear, Plaintiff has not explained how the Fourth Amendment imposed a duty on the officers to protect his property from burglary by a third party after entry into the residence.  Nor has he cited any clearly established law that creates such a duty under the Fourth Amendment.

**B.** **Defendants Roper and the City of Birmingham are Entitled to Summary Judgment on Plaintiff's § 1983 *Monell* [10] Claim**

In his Complaint, Plaintiff asserts that the City and Roper (1) failed to conduct appropriate background checks before hiring personnel, (2) failed to properly investigate complaints against the officers, (3) failed to implement a review procedure to find instances of improper searches and seizures, (4) negligently retained officers who engaged in unlawful searches and seizures, and (5) inadequately trained the officers about the laws pertaining to searches and seizures. (Doc. # 1 at ¶¶ 30-42). Defendants seek summary judgment on these claims because no municipal policy or custom caused Plaintiff's alleged injuries. (Doc. # 64-1 at 21-22). Plaintiff's opposition brief does not explain how a custom or policy instituted by the City or Roper was a moving force behind the alleged constitutional violations. (*See* Doc. # 66 at 19-32). Because Plaintiff has not argued why his *Monell* claims should survive summary judgment in the argument section of his brief, the court finds that he has abandoned any § 1983 claim against Defendants Roper and the City of Birmingham. *See Coalition for the Abolition of Marijuana Prohibition*, 219 F.3d at 1325-26. Therefore, Defendants Roper and the City of Birmingham are entitled to summary judgment.

Alternatively, even if Plaintiff has not abandoned the *Monell* claims by presenting no supporting argument for them in the argument section of his opposition brief (and, to be clear, he has), the court concludes that Plaintiff has not presented any evidence to support a claim under *Monell.* Plaintiff has not presented any Rule 56 evidence to support the City's purported "custom of inappropriately, negligently, recklessly, and/or unjustifiably considering evidence" before police officers. (*See* Doc. # 66 at 10). The record citations provided by Plaintiff concern the officers' conduct and knowledge during the investigation into the call to the Residence. (*See*

---

[10] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

*id.*).  Plaintiff has not pointed to or identified a longstanding or widespread practice of Birmingham police officers ignoring evidence, such that the court could say that the police department's policymakers must have known about repeated failures to investigate.  *Cf. Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310-11 (11th Cir. 2011).  Nor has he identified a specific policy of the Birmingham Police Department that is unconstitutional.  *Cf. id.* at 1311 ("In the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff[ ] must show that the policy itself is unconstitutional.") (quoting *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)).  Thus, Plaintiff's *Monell* claim against Roper and the City of Birmingham cannot go forward.

Likewise, Plaintiff has not provided substantial evidence that the City of Birmingham Police Department improperly trained the officers.  "For [Plaintiff's improper training] *Monell* claim to survive summary judgment, he must bring forth some evidence of a pattern of improper training to sustain his claim, and he must show that [the City of Birmingham] was aware of the deficiencies in the program."  *Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005).  While Plaintiff contests Defendants' failure to officer "any particulars or specifics of [the] substance of training," he has not offered any evidence of improper police training by the City or Birmingham to support his negligent training claim in the Complaint.  (Doc. # 66 at 10-11).  Therefore, Defendants are entitled to summary judgment on any *Monell* claim in this action premised on the officers' training.

### C.  Defendants Higgins, Hallman, Smith, and Allison are Entitled to Summary Judgment on the State-Law Theft and Burglary Tort Claims

In the Complaint, Plaintiff brought burglary and theft of property tort claims against Defendants Higgins, Hallman, Smith, and Allison.  (Doc. # 1 at ¶¶ 43-48).  Defendants argue in their summary judgment motion that these claims should be dismissed because the court

previously dismissed the theft and burglary claims against Wells Fargo and Hauck. (Doc. # 64-1 at 22). Alternatively, they invoke discretionary-function immunity under Alabama Code § 6-5-338(a). (*Id.* at 22-26). Plaintiff has not responded to these arguments in his opposition brief. (*See* Doc. # 66 at 19-32). Therefore, the court finds that he has abandoned his state-law claims against Defendants Higgins, Hallman, Smith, and Allison, and they are accordingly entitled to summary judgment on those claims. *Coalition for the Abolition of Marijuana Prohibition*, 219 F.3d at 1325-26.

But even if Plaintiff had not abandoned these claims, Defendants are entitled to discretionary-function immunity from any state law tort claim against them. Municipal police officers in Alabama (referred to as peace officers) are afforded discretionary-function immunity from tort liability for conduct committed within the line and scope of law enforcement duties. *Hollis v. City of Brighton*, 885 So. 2d 135, 142-43 (Ala. 2004) (quoting Ala. Code § 6-5-338(a)). A police officer's statutory tort immunity is determined by the same standard as state-agent immunity under Alabama law. *Id.* at 143. Among other acts, a municipal police officer is immune from civil liability in his or her personal capacity for his or her exercise of judgment in enforcing criminal laws. *Id.* (quoting *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)).

To analyze discretionary-function immunity, a court must first determine whether a defendant was performing a discretionary function when an alleged tortious act occurred. *Wood v. Kesler*, 323 F.3d 872, 883 (11th Cir. 2003). If a defendant was performing a discretionary function, a plaintiff must show that the defendant "acted in bad faith, with malice or willfulness" to defeat discretionary-function immunity. *Id.* (quoting *Scarbrough v. Myles*, 245 F.3d 1299, 1303 n. 9 (11th Cir. 2001)).

Here, it cannot be questioned that the officers acted within the line and scope of their law enforcement duties when investigating the burglary report at the Residence. And, the Rule 56 record reveals no basis for a reasonable jury to find that the officers acted with bad faith, malice, or willful intent to harm Plaintiff when entering the Residence or when leaving it in the possession of the reporting parties who had a work order for the Residence. Thus, even if the state-law tort claims were not abandoned by Plaintiff (and, to be clear, they have been), Defendants Higgins, Hallman, Smith, and Allison are entitled to discretionary-function immunity for the claims.

## V.    Conclusion

For the reasons explained above, Plaintiff's motion to deem certain requests for admission to be admitted (Doc. # 66) is due to be granted, Defendants' motion to withdraw or amend the responses to those requests for admission (Doc. # 69) is due to be denied without prejudice for purposes of the summary judgment proceedings, and Defendants' motion for summary judgment (Doc. # 64) is due to be granted. An order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this November 28, 2017.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE